## Lena Kugel *v.* Uriah Painter et al., Appellants.

*Landlord and tenant—Lease—Condition of lease—Use for railroad purposes.*

A railroad company, desiring to enlarge its depot, leased a strip of adjoining land at a certain rental per year. The preamble of the lease recited that it was "for the purpose of more conveniently transacting the business of the said company, and for the better accommodation of the public." The lease of the land was for "so long as the same shall be used for railroad purposes." The depot was subsequently abandoned, and the land upon which it stood was sold by the railroad company, and the lease assigned to the purchaser. The purchaser and his tenants used the property merely as a private siding. *Held* (1) that the meaning of the lease was that the land should be used for public railroad purposes; (2) that when the land was used merely for a private siding, the lease thereupon ceased.

Argued Feb. 12, 1895. Appeal, No. 157, July T., 1894, by defendants, from judgment of C. P. Chester Co., Oct. T., 1893, No. 27, on verdict for plaintiff. Before Sterrett, C. J., McCollum, Mitchell, Dean and Fell, JJ. Affirmed.

Ejectment for a strip of ground in the borough of West Chester. Before CLAYTON, P. J., specially presiding.

At the trial it appeared that on May 23, 1847, John J. Parker and H. R. Guss who were then owners of the land in controversy executed a lease of the land to the West Chester Railroad Company. The material portions of the lease are as follows:

"Whereas, the West Chester Railroad Company, of the county of Chester, Pennsylvania, is now engaged in altering and improving the railroad depot fronting on Gay street, in the borough of West Chester, county and state aforesaid, for the purpose of more conveniently transacting the business of the said company and for the better accommodation of the public, and being also desirous of enlarging and improving their car house adjoining said depot, have concluded to remove their present frame car house and rebuild upon an enlarged site a larger and more permanent building, but in order to do so it becomes necessary to have a greater extent of ground for that purpose than said company now possess.

" And whereas, Henry R. Guss and John J. Parker, both of the borough aforesaid, who own the lands adjoining said company's present car house, (the former on the west and the latter on the east thereof,) have agreed with said company that each of them would lease a strip of their lands respectively to said company for the purpose of enabling said company to erect a larger and more capacious car house, as aforesaid.

"Now this indenture witnesseth, that the said Henry R. Guss for the consideration hereinafter mentioned, has demised and leased and by these presents doth demise and lease unto the West Chester Railroad Company aforesaid and its assigns, so long as the same shall be used for railroad purposes, the following described premises, to wit: . . . .

" And in consideration of the premises the said company contracts and agrees to pay to the said H. R. Guss, his heirs, executors, administrators or assigns, on the twenty-third day of May of each and every ensuing year, ensuing the date hereof, the annual rent of twelve dollars, the payment of said rent to cease when the property hereby leased ceases to be used for railroad property."

Since 1864, the fronting on Gay street has not been used as

a passenger depot.   The West Chester Railroad Company, having leased its road to the West Chester & Philadelphia Railroad Company, the depot of the latter company, erected on Market street, about four squares distant from the Gay street depot, has been used for receiving and landing passengers, as well as for the greater part of the freight business theretofore transacted at the Gay street depot.   Ever since 1864, however, freight has been sent over the tracks of the railroad company into and from the car house.   In 1881 the railroad company assigned and conveyed all their rights in the car house, including the Parker lease, to U. H. Painter.   The evidence tended to show that in recent years the tracks on the land in controversy had been used merely as private sidings.

The court charged as follows:

" Like most cases brought before the courts for adjudication, the present one turns upon a very narrow point, and there is but one point in the case, and that will depend entirely upon the construction to be put upon the lease by which the railroad company acquired the right to use this strip of land.   The law requires all writings to be construed by the court, and it is the duty of the jury to take from the court the construction it puts upon a written paper.   The testimony of witnesses is always harmonized and construed by the jury.   The foundation, therefore, of the title of the defendants to this strip of ground, lies in this written lease.   You will notice by the preamble to the lease that the " West Chester Railroad Company, of the county of Chester, Pennsylvania, is now engaged in altering and improving the railroad depot fronting on Gay st eet, in the borough of West Chester county and state aforesaid, for the purpose of more conveniently transacting the business of the said company, and for the better accommodation of the public."   That is the preamble to the lease.   That is to say, the railroad company found itself hampered for want of room for the purpose of transacting its public business.   A railroad company is a public corporation.   A railroad is one of the highways of the state.   It is operated by a corporation, but still it is a state institution.   It is created for the purpose of accommodating the public, not for the accommodation of individuals.   Every person has a right to travel over a public highway.   Every individual has a right to travel on a railroad, subject only to

certain reasonable regulations, such as behaving himself well, paying the toll, or paying a regular freight, in which there is to be no discrimination; all are to be treated alike. Now, it seems for the purpose of conducting this public business, this railroad company found it necessary to enlarge its depot. When we come to look to the title of the railroad company for the ground upon which its depot stands, we find it was acquired by grant and not by public condemnation.

"It bought, like an individual, the ground upon which it built its depot. It was, therefore, the owner in fee of that improvement, and could sell it whenever in the judgment of the board of directors the exigencies of the case required. It did not require the intervention of the commonwealth to divest it of the title which it had to that piece of ground. It had bought it and it could sell it. [And when it once did exercise that right and sell the land upon which its depot stands, without inserting in the deed any restriction, or without preserving its right to use it as a depot, the right to use that as a depot at once ceased, and ceased forever. When, therefore, the depot was no longer to be used for the accommodation of the public, for the carrying of freight or for the transporting of passengers, the condition contained in this lease was broken.] [6] For you will observe that in order to enlarge its depot it was necessary to go over on the land of a neighbor, and in order to get the right to build upon that land it leased this little strip of ground now in question. That lease was perpetual, so long as the depot was used for railroad purposes. It was perpetual. upon two conditions, one that $25.00 a year rent should be paid, and the other that the land should be used for railroad purposes. Whenever, therefore, the railroad or its lessees, persons holding under it, should cease to pay the rent. or should cease to use the land for railroad purposes, the condition upon which the lease was made was ended, and the lease terminated, and the landlord would have a right to recover possession. Now that is a brief statement of the facts as they are before you, and the only difficulty in the case is the proper construction to be put upon the words in this lease 'for railroad purposes.' You will notice, after you get down from the preamble, and after we read the description of the property leased, these words: 'That the said John J. Parker, for the consideration

hereinafter mentioned, has demised and leased by these presents, and by these presents doth demise and lease, unto the West Chester Railroad Company above named, and its assigns, so long as the same shall be used for railroad purposes, the following described tract of land.' You will observe it is in the lease, ' so long as the same shall be used for railroad purposes,' and the preamble says they were to be public railroad purposes, not private. [The preamble says : ' For the accommodation of the public it became necessary to enlarge the depot,' and the lease shows that the land was leased for the purpose of carrying out that design, and that the lease was to continue so long as the land was used for railroad purposes.

" Now, gentlemen, I construe that to mean, so long as the land was used for public railroad purposes.] [7] I do not hold that it was necessary that it should be used as fully as it was at that time. I do not hold they were bound to build a larger depot if it became necessary, nor do I hold that they could not reduce their depot if the business did not require it as large as it was then. But I do hold that this land was to be occupied, at least partly, by a railroad depot, and not by an individual proprietor who intended to use it as a storage house or for some other purpose, or who intended only to use the railroad so far as it accommodated his individual ownership or rights in the property. [And holding, therefore, that the kind of use for railroad purposes that the defendant was bound to observe was a public railroad and not a private one, I hold that the defendants here, if you find that it is not a public depot, have no title, and the plaintiff is entitled to a verdict.] [8]

" Now, under the weight of the evidence, it would seem—the evidence, of course, is for the jury, except what is in writing, and they must take the construction put upon that by the court —[the evidence would seem to pretty clearly establish that this depot is not used for railroad purposes any more.] [9] True, cars may be run into it, but the public have no general right to the use of that depot. They have got to ask privilege before they can get in there. They are trespassers if they go in without privilege. There is no means by which small parcels of freight can be transmitted ; there are no agents to receive them, no bills of lading to be given for them, there is nobody to receipt for the freight or to take down from whom

it comes or to whom it is to be transmitted. The only railroad use to which the land now seems to be subjected is the entry of cars at the will of the owner of the land, or to bring in cars freighted with his own merchandise. It does not seem to be used as a general railway freight or passenger station. I do not hold that it was necessary to maintain a passenger depot there. I think under a liberal construction of this lease the railroad company, if it continued to own the land, could have established a freight station there, and that would be within the meaning of the lease. But they certainly could not stop both, sell the land and divest themselves of all title, and the landlord still be compelled to receive the rent and allow them to use his land. He had the right when he leased either to sell them the land or lease it to them. For some good purpose the landlord saw proper to keep the title to his land, and he leased it. For some proper purpose the railroad company saw proper to exercise that right and merely lease and not buy. They could have condemned the land if they had seen proper; perhaps they could have compelled him to let them have it for railroad purposes by paying the damages. But they got together and agreed upon the lease, and the agreement was that the lease should last so long as the depot was used for railroad purposes.

" [If you are satisfied, therefore, under all the evidence, that it is not now used for general railroad purposes, using the words 'general railroad purposes' as I have described, at least for the transmission of freight by the general public and not by individuals, and without asking permission, your verdict ought to be for the plaintiff.] " [10]

The defendants submitted the following points :

" 1. The assignment of the lease and disclaimer by the railroad company do not amount to an abandonment of the property for railroad purposes. *Answer :* I affirm that that the mere assignment and disclaimer do not amount to an abandonment, but the facts of the case would seem to prove that it has been no longer used for railroad purposes such as I have described." [1]

" 2. The present user of the strip in question, under the undisputed facts of the case, is a user for railroad purposes, within the meaning of the lease, and the verdict must be for the defendants. *Answer :* I decline to so charge you." [2]

" 3. It being undisputed that freight is received and delivered in this depot in cars of the railroad company, and that the strip in question is embraced within the walls of the depot property, and is used in connection with the loading and unloading of this freight, there is no sufficient evidence of abandonment to justify a submission to the jury. *Answer :* I decline to so charge you." [3]

" 5. Under all the evidence, the verdict must be for the defendants. *Answer :* That is declined." [4]

" 6. The present use of the property, if not covered by the grant to the railroad company, having been continued, under the undisputed facts in the case, for 21 years and upwards before the impetration of the writ in this case, a grant for such use will be presumed, and no recovery can be had in this action. *Answer :* I decline to affirm that point, gentlemen, because it appears that the rent was regularly paid by the railroad company, and there is no sufficient evidence that the plaintiff had notice that the railroad company did intend to abandon it, and I therefore decline to affirm that point." [5]

Verdict and judgment for plaintiff.    Defendants appealed.

*Errors assigned* were  (1–10) above instructions, quoting them.

*William T. Barber* and  *R. T. Cornwell, Gibbons Gary Cornwell* with them, for appellants, cited: Morawetz on Private Corporations, sec. 370 ; Redfield on Railroads, sec. 6, p. 4, and sec. 221: Crolley v. Minn. & St. Louis Ry., 14 Am. & Eng. R. R. Cases, 47, 50 ; Noll v. D. B. & M. R. Co., 32 Iowa, 66 ; Com. v. 10th Mass. Turnpike Co., 5 Cush. 509 ; Wheatley v. Chrisman, 24 Pa. 304.

*William Butler*, of *Butler & Windle*, for appellee, cited: Nashua & Lowell R. R. v. Proprietors of Locks & Canals, 104 Mass. 1 ; Improvement Co. v. McCreary, 58 Pa. 305 ; Nearhoff v. Addleman, 31 Pa. 279.

PER CURIAM, March 11, 1895 :

This case was carefully and ably tried, and little, if anything, remains to be added by us.  The questions involved are

so clearly and accurately presented in the charge of the learned judge who specially presided at the trial, that it is unnecessary to restate them. An examination of the record, in connection with the several assignments of error, has satisfied us as to the correctness not only of his construction of the lease of May 23, 1847, and other papers in evidence, but also of his instructions generally to the jury. In affirming defendants' fourth point he rightly charged in substance that the verdict must be for the defendant, " unless the jury find that the property is no longer used for railroad purposes." The verdict for plaintiff necessarily implies a finding in her favor of the controlling fact in the case, viz : that the property in controversy has ceased to be used " for railroad purposes," within the true intent and meaning of the lease of 1847, as construed by the court. The learned judge's answers to the remaining five points for charge submitted by defendants are also free from any substantial error. There is nothing in any of the specifications that requires further comment. Neither of them is sustained.

Judgment affirmed.